# GISBRECHT ET AL. *v.* BARNHART, COMMISSIONER OF SOCIAL SECURITY

No. 01–131.   Argued March 20, 2002—Decided May 28, 2002

*Eric Schnaufer* argued the cause for petitioners. With him on the briefs were *Eric Schnapper* and *Tim Wilborn.*

*David B. Salmons* argued the cause *pro hac vice* for respondent. With him on the brief were *Solicitor General Olson, Assistant Attorney General McCallum, Deputy Solicitor General Clement, William Kanter,* and *Frank A. Rosenfeld.**

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the fees that may be awarded attorneys who successfully represent Social Security benefits claimants in court. Under 42 U. S. C. § 406(b) (1994 ed. and Supp. V),[1] a prevailing claimant's fees are payable only out of the benefits recovered; in amount, such fees may not exceed 25 percent of past-due benefits. At issue is a question that has sharply divided the Federal Courts of Appeals: What is the appropriate starting point for judicial determinations of "a reasonable fee for [representation before the court]"? See *ibid.* Is the contingent-fee agreement between claimant and counsel, if not in excess of 25 percent of past-due benefits, presumptively reasonable? Or should courts begin with a lodestar calculation (hours reasonably spent on the case times reasonable hourly rate) of the kind we have approved under statutes that shift the obligation to pay to the loser in the litigation? See *Hensley* v. *Eckerhart,* 461 U. S. 424, 426 (1983) (interpreting Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988, which allows a "prevailing party" to recover from his adversary "a reasonable attor-

---

*Jeffrey Robert White* filed a brief for the Association of Trial Lawyers of America as *amicus curiae* urging reversal.

*Daniel J. Popeo* and *Richard A. Samp* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging affirmance.

*Nancy G. Shor, Kirk B. Roose, Joel F. Friedman, Robert E. Rains,* and *Eric Buchanan* filed a brief for the National Organization of Social Security Claimants' Representatives as *amicus curiae.*

[1] 49 Stat. 624, as amended.

ney's fee as part of the costs" (internal quotation marks omitted)).

Congress, we conclude, designed § 406(b) to control, not to displace, fee agreements between Social Security benefits claimants and their counsel. Because the decision before us for review rests on lodestar calculations and rejects the primacy of lawful attorney-client fee agreements, we reverse the judgment below and remand for recalculation of counsel fees payable from the claimants' past-due benefits.

## I

### A

Fees for representation of individuals claiming Social Security old-age, survivor, or disability benefits, both at the administrative level and in court, are governed by prescriptions Congress originated in 1965. Social Security Amendments of 1965, 79 Stat. 403, as amended, 42 U. S. C. § 406.[2]

---

[2] Before 1965, Congress did not explicitly authorize attorney's fees for in-court representation of Social Security benefits claimants. At least two Courts of Appeals, however, concluded that 42 U. S. C. § 405(g) implicitly authorized such fees. See *Bowen* v. *Galbreath*, 485 U. S. 74, 75–76 (1988) (citing *Celebrezze* v. *Sparks*, 342 F. 2d 286 (CA5 1965)) ("Under 42 U. S. C. § 405(g), a court reviewing [a Social Security benefits decision] has the power to enter 'a judgment affirming, modifying, or reversing the decision . . . .' The court in *Sparks* reasoned that where a statute gives a court jurisdiction, it must be presumed, absent any indication to the contrary, that the court was intended to exercise all the powers of a court, including the power to provide for payment of attorney's fees out of any recovery. 342 F. 2d, at 288–289 [citing *Folsom* v. *McDonald*, 237 F. 2d 380, 382–383 (CA4 1956)].").

As to administrative proceedings, the Social Security Act originally made no provision for attorney's fees. 49 Stat. 620 (1935). Four years later, Congress amended the Act to permit the Social Security Board to prescribe maximum fees attorneys could charge for representation of claimants before the agency. Social Security Act Amendments of 1939, 53 Stat. 1360. Congress expected the need for counsel in agency proceedings to be slim. H. R. Rep. No. 728, 76th Cong., 1st Sess., 44–45 (1939); S. Rep. No. 734, 76th Cong., 1st Sess., 53 (1939). The Board subsequently established a maximum fee of $10, permitting a higher fee only by petition

The statute deals with the administrative and judicial review stages discretely: § 406(a) governs fees for representation in administrative proceedings; § 406(b) controls fees for representation in court. See also 20 CFR § 404.1728(a) (2001).

For representation of a benefits claimant at the administrative level, an attorney may file a fee petition or a fee agreement. 42 U. S. C. § 406(a). In response to a petition, the agency may allow fees "for services performed in connection with any claim before" it; if a determination favorable to the benefits claimant has been made, however, the Commissioner of Social Security "shall . . . fix . . . a reasonable fee" for an attorney's services. § 406(a)(1) (1994 ed.) (emphasis added). In setting fees under this method, the agency takes into account, in addition to any benefits award, several other factors. See 20 CFR § 404.1725(b) (2001).[3] Fees may

---

to the agency. 20 CFR § 403.713(d) (1949). The agency later prescribed separate fees for representation at the initial and appellate levels of the administrative process. 20 CFR § 404.976 (1961).

[3] Title 20 CFR § 404.1725(b) provides:

"*Evaluating a request for approval of a fee.*

"(1) When we evaluate a representative's request for approval of a fee, we consider the purpose of the social security program, which is to provide a measure of economic security for the beneficiaries of the program, together with—

"(i) The extent and type of services the representative performed;

"(ii) The complexity of the case;

"(iii) The level of skill and competence required of the representative in giving the services;

"(iv) The amount of time the representative spent on the case;

"(v) The results the representative achieved;

"(vi) The level of review to which the claim was taken and the level of the review at which the representative became your representative; and

"(vii) The amount of fee the representative requests for his or her services, including any amount authorized or requested before, but not including the amount of any expenses he or she incurred.

"(2) Although we consider the amount of benefits, if any, that are payable, we do not base the amount of fee we authorize on the amount of the benefit alone, but on a consideration of all the factors listed in this section. The benefits payable in any claim are determined by specific provisions

be authorized, on petition, even if the benefits claimant was unsuccessful. § 404.1725(b)(2).

As an alternative to fee petitions, the Social Security Act, as amended in 1990, accommodates contingent-fee agreements filed with the agency in advance of a ruling on the claim for benefits. Omnibus Budget Reconciliation Act of 1990, 104 Stat. 1388–266 to 1388–267, as amended, 42 U. S. C. §§ 406(a)(2)–(4) (1994 ed. and Supp. V). If the ruling on the benefits claim is favorable to the claimant, the agency will generally approve the fee agreement, subject to this limitation: Fees may not exceed the lesser of 25 percent of past-due benefits or $4,000 (increased to $5,300 effective February 2002). §§ 406(a)(2)(A)(ii), (iii) (1994 ed.); 67 Fed. Reg. 2477 (2002); see Social Security Administration, Office of Hearings and Appeals, Litigation Law Manual (HALLEX) I–5–109 III.A (Feb. 5, 1999).

For proceedings in court, Congress provided for fees on rendition of "a judgment favorable to a claimant." 42 U. S. C. § 406(b)(1)(A) (1994 ed., Supp. V). The Commissioner has interpreted § 406(b) to "prohibi[t] a lawyer from charging fees when there is no award of back benefits." Tr. of Oral Arg. 37–38; see Brief in Opposition 12, n. 12 (reading § 406(b) to "prohibi[t] other [fee] arrangements such as non-contingent hourly fees").

As part of its judgment, a court may allow "a reasonable fee . . . not in excess of 25 percent of the . . . past-due benefits" awarded to the claimant. § 406(b)(1)(A). The fee is payable "out of, and not in addition to, the amount of [the] past-due benefits." *Ibid.* Because benefits amounts figuring in the fee calculation are limited to those past due, attorneys may not gain additional fees based on a claimant's continuing entitlement to benefits.

The prescriptions set out in §§ 406(a) and (b) establish the exclusive regime for obtaining fees for successful represen-

---

of law and are unrelated to the efforts of the representative. We may authorize a fee even if no benefits are payable."

tation of Social Security benefits claimants. Collecting or even demanding from the client anything more than the authorized allocation of past-due benefits is a criminal offense. §§ 406(a)(5), (b)(2) (1994 ed.); 20 CFR §§ 404.1740–1799 (2001).

In many cases, as in the instant case, the Equal Access to Justice Act (EAJA), enacted in 1980, effectively increases the portion of past-due benefits the successful Social Security claimant may pocket. 94 Stat. 2329, as amended, 28 U. S. C. § 2412. Under EAJA, a party prevailing against the United States in court, including a successful Social Security benefits claimant, may be awarded fees payable by the United States if the Government's position in the litigation was not "substantially justified." § 2412(d)(1)(A). EAJA fees are determined not by a percent of the amount recovered, but by the "time expended" and the attorney's "[hourly] rate," § 2412(d)(1)(B), capped in the mine run of cases at $125 per hour, § 2412(d)(2)(A).[4] Cf. 5 U. S. C. § 504 (authorizing payment of attorney's fees by the Government when a party prevails in a federal agency adjudication).

Congress harmonized fees payable by the Government under EAJA with fees payable under § 406(b) out of the claimant's past-due Social Security benefits in this manner: Fee awards may be made under both prescriptions, but the claimant's attorney must "refun[d] to the claimant the amount of the smaller fee." Act of Aug. 5, 1985, Pub. L. 99–80, § 3, 99 Stat. 186. "Thus, an EAJA award offsets an award under Section 406(b), so that the [amount of the total past-due benefits the claimant actually receives] will be increased by the . . . EAJA award up to the point the claimant receives 100 percent of the past-due benefits." Brief for United States 3.

---

[4] A higher fee may be awarded if "the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceeding involved, justifies a higher fee." 28 U. S. C. § 2412(d)(2)(A)(ii).

B

Petitioners Gary Gisbrecht, Barbara Miller, and Nancy Sandine brought three separate actions in the District Court for the District of Oregon under 42 U. S. C. § 405(g) (1994 ed.),[5] seeking Social Security disability benefits under Title II of the Social Security Act. All three petitioners were represented by the same attorneys, and all three prevailed on the merits of their claims. Gisbrecht was awarded $28,366 in past-due benefits; Miller, $30,056; and Sandine, $55,952. Each petitioner then successfully sought attorneys' fees payable by the United States under EAJA: Gisbrecht was awarded $3,339.11, Miller, $5,164.75, and Sandine, $6,836.10.

Pursuant to contingent-fee agreements standard for Social Security claimant representation, see 1 B. Samuels, Social Security Disability Claims § 21:10 (2d ed. 1994), Gisbrecht, Miller, and Sandine had each agreed to pay counsel 25 percent of all past-due benefits recovered, App. to Pet. for Cert. 72–86. Their attorneys accordingly requested § 406(b) fees of $7,091.50 from Gisbrecht's recovery, $7,514 from Miller's, and $13,988 from Sandine's. Given the EAJA offsets, the amounts in fact payable from each client's past-due benefits recovery would have been $3,752.39 from Gisbrecht's recovery, $2,349.25 from Miller's, and $7,151.90 from Sandine's.

Following Circuit precedent, see *Allen* v. *Shalala*, 48 F. 3d 456, 458–459 (CA9 1995), the District Court in each case declined to give effect to the attorney-client fee agreement. *Gisbrecht* v. *Apfel*, No. CV–98–0437–RE (Ore., Apr. 14, 1999); *Miller* v. *Apfel*, No. CV–96–6164–AS (Ore., Mar. 30, 1999); *Sandine* v. *Apfel*, No. CV–97–6197–ST (Ore., June 18, 1999). Instead, the court employed for the § 406(b) fee calculation a "lodestar" method, under which the number of hours reasonably devoted to each case was multiplied by a reasonable

---

[5] Section 405(g) authorizes judicial review of administrative denials of applications for Social Security benefits.

hourly fee. This method yielded as § 406(b) fees $3,135 from Gisbrecht's recovery, $5,461.50 from Miller's, and $6,550 from Sandine's. Offsetting the EAJA awards, the court determined that no portion of Gisbrecht's or Sandine's past-due benefits was payable to counsel, and that only $296.75 of Miller's recovery was payable to her counsel as a § 406(b) fee. The three claimants appealed.[6]

Adhering to Circuit precedent applying the lodestar method to calculate fees under § 406(b), the Court of Appeals for the Ninth Circuit consolidated the cases[7] and affirmed the District Court's fee dispositions. *Gisbrecht* v. *Apfel*, 238 F. 3d 1196 (2000). The Appeals Court noted that fees determined under the lodestar method could be adjusted by applying 12 further factors, one of them, "whether the fee is fixed or contingent." *Id.*, at 1198 (quoting *Kerr* v. *Screen Extras Guild, Inc.*, 526 F. 2d 67, 70 (CA9 1975)).[8] While "a district

---

[6] Although the claimants were named as the appellants below, and are named as petitioners here, the real parties in interest are their attorneys, who seek to obtain higher fee awards under § 406(b). For convenience, we nonetheless refer to claimants as petitioners. See *Hopkins* v. *Cohen,* 390 U. S. 530, 531, n. 2 (1968). We also note that the Commissioner of Social Security here, as in the Ninth Circuit, has no direct financial stake in the answer to the § 406(b) question; instead, she plays a part in the fee determination resembling that of a trustee for the claimants. See, *e. g.*, *Lewis* v. *Secretary of Health and Human Servs.*, 707 F. 2d 246, 248 (CA6 1983).

[7] A fourth case, *Anderson* v. *Apfel*, No. CV–96–6311–HO (Ore., Sept. 29, 1999), was also consolidated with petitioners' cases; we denied certiorari in *Anderson* in the order granting certiorari on petitioners' question. See 534 U. S. 1039 (2001).

[8] *Kerr* directed consideration of "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the pro-

court must *consider* a plaintiff's request to increase a fee [based on a contingent-fee agreement]," the Ninth Circuit stated, "a court 'is not required to articulate its reasons' for accepting or rejecting such a request." 238 F. 3d, at 1199 (quoting *Widrig* v. *Apfel,* 140 F. 3d 1207, 1211 (CA9 1998)) (emphasis in original).

We granted certiorari, 534 U. S. 1039 (2001), in view of the division among the Circuits on the appropriate method of calculating fees under § 406(b). Compare *Coup* v. *Heckler,* 834 F. 2d 313 (CA3 1987); *Craig* v. *Secretary, Dept. of Health and Human Servs.,* 864 F. 2d 324 (CA4 1989); *Brown* v. *Sullivan,* 917 F. 2d 189 (CA5 1990); *Cotter* v. *Bowen,* 879 F. 2d 359 (CA8 1989); *Hubbard* v. *Shalala,* 12 F. 3d 946 (CA10 1993); and *Kay* v. *Apfel,* 176 F. 3d 1322 (CA11 1999) (all following, in accord with the Ninth Circuit, a lodestar method), with *Wells* v. *Sullivan,* 907 F. 2d 367 (CA2 1990); *Rodriguez* v. *Bowen,* 865 F. 2d 739 (CA6 1989) (en banc); and *McGuire* v. *Sullivan,* 873 F. 2d 974 (CA7 1989) (all giving effect to attorney-client contingent-fee agreement, if resulting fee is reasonable).[9] We now reverse the Ninth Circuit's judgment.

## II

Beginning with the text, § 406(b)'s words, "a reasonable fee . . . not in excess of 25 percent of . . . the past-due benefits," read in isolation, could be construed to allow either the Ninth Circuit's lodestar approach or petitioners' position that the attorney-client fee agreement ordinarily should control, if not "in excess of 25 percent." The provision

---

fessional relationship with the client, and (12) awards in similar cases." 526 F. 2d, at 69–70 (citing *Johnson* v. *Georgia Highway Express, Inc.,* 488 F. 2d 714, 717–719 (CA5 1974)).

[9] Cf. *Ramos Colon* v. *Secretary of Health and Human Servs.,* 850 F. 2d 24, 26 (CA1 1988) *(per curiam)* ("a court is not required to give blind deference to . . . a contractual fee agreement, and must ultimately be responsible for fixing a reasonable fee for the judicial phase of the proceedings" (internal quotation marks omitted)).

instructs "a reasonable fee," which could be measured by a lodestar calculation. But § 406(b)'s language does not exclude contingent-fee contracts that produce fees no higher than the 25 percent ceiling. Such contracts are the most common fee arrangement between attorneys and Social Security claimants. See Department of Health and Human Services, Social Security Administration, Office of Hearings and Appeals, Report to Congress: Attorney Fees Under Title II of the Social Security Act 15, 66, 70 (July 1988) (hereinafter SSA Report); Brief for National Organization of Social Security Claimants' Representatives as *Amicus Curiae* 1–2. Looking outside the statute's inconclusive text, we next take into account, as interpretive guides, the origin and standard application of the proffered approaches.

The lodestar method has its roots in accounting practices adopted in the 1940's to allow attorneys and firms to determine whether fees charged were sufficient to cover overhead and generate suitable profits. W. Ross, The Honest Hour: The Ethics of Time-Based Billing by Attorneys 16 (1996) (hereinafter Honest Hour). An American Bar Association (ABA) report, published in 1958, observed that attorneys' earnings had failed to keep pace with the rate of inflation; the report urged attorneys to record the hours spent on each case in order to ensure that fees ultimately charged afforded reasonable compensation for counsels' efforts. See Special Committee on Economics of Law Practice, The 1958 Lawyer and His 1938 Dollar 9–10 (reprint 1959).

Hourly records initially provided only an internal accounting check. See Honest Hour 19. The fees actually charged might be determined under any number of methods: the annual retainer; the fee-for-service method; the "eyeball" method, under which the attorney estimated an annual fee for regular clients; or the contingent-fee method, recognized by this Court in *Stanton* v. *Embrey,* 93 U. S. 548, 556 (1877), and formally approved by the ABA in 1908. See Honest Hour 13–19. As it became standard accounting practice to

record hours spent on a client's matter, attorneys increasingly realized that billing by hours devoted to a case was administratively convenient; moreover, as an objective measure of a lawyer's labor, hourly billing was readily impartable to the client. *Id.*, at 18. By the early 1970's, the practice of hourly billing had become widespread. See *id.*, at 19, 21.

The federal courts did not swiftly settle on hourly rates as the overriding criterion for attorney's fee awards. In 1974, for example, the Fifth Circuit issued an influential opinion holding that, in setting fees under Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–5(k) (1970 ed.), courts should consider not only the number of hours devoted to a case but also 11 other factors. *Johnson* v. *Georgia Highway Express, Inc.*, 488 F. 2d 714, 717–719 (1974).[10] The lodestar method did not gain a firm foothold until the mid-1970's, see *Lindy Bros. Builders, Inc. of Philadelphia* v. *American Radiator & Standard Sanitary Corp.*, 487 F. 2d 161 (CA3 1973), appeal after remand, 540 F. 2d 102 (1976), and achieved dominance in the federal courts only after this Court's decisions in *Hensley* v. *Eckerhart*, 461 U. S. 424 (1983), *Blum* v. *Stenson*, 465 U. S. 886 (1984), and *Pennsylvania* v. *Delaware Valley Citizens' Council for Clean Air*, 478 U. S. 546 (1986).

Since that time, "[t]he 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence." *Burlington* v. *Dague*, 505 U. S. 557, 562 (1992) (relying on *Hensley, Blum,* and *Delaware Valley* to apply lodestar method to fee determination under Solid Waste Disposal Act, § 7002(e), 42 U. S. C. § 6972(e) (1988 ed.), and Clean Water Act, § 505(d), 33 U. S. C. § 1365(d) (1988 ed.), and noting prior application of lodestar method to Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988 (1988 ed., Supp. III); Title VII of Civil Rights Act of 1964, 42 U. S. C. § 2000e–5(k) (1988 ed., Supp. III); and Clean Air Act, 42 U. S. C. § 7604(d) (1988 ed.)). As we recognized in *Hensley,*

---

[10] See *supra,* at 798–799, n. 8.

"[i]deally, . . . litigants will settle the amount of a fee." 461 U. S., at 437.[11] But where settlement between the parties is not possible, "[t]he most useful starting point for [court determination of] the amount of a reasonable fee [payable by the loser] is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.,* at 433. Thus, the lodestar method today holds sway in federal-court adjudication of disputes over the amount of fees properly shifted to the loser in the litigation. See *id.,* at 440 (Burger, C. J., concurring) (decision addresses statute under which "a lawyer seeks to have his adversary pay the fees of the prevailing party").

Fees shifted to the losing party, however, are not at issue here. Unlike 42 U. S. C. § 1988 (1994 ed. and Supp. V) and EAJA, 42 U. S. C. § 406(b) (1994 ed., Supp. V) does not authorize the prevailing party to recover fees from the losing party. Section 406(b) is of another genre: It authorizes fees payable from the successful party's recovery. Several statutes governing suits against the United States similarly provide that fees may be paid from the plaintiff's recovery. See, *e. g.,* Federal Tort Claims Act (FTCA), 28 U. S. C. § 2678 ("No attorney shall charge, demand, receive, or collect for services rendered, fees in excess of 25 per centum of any [court] judgment rendered [in an FTCA suit], or in excess of 20 per centum of any award, compromise, or settlement made [by a federal agency to settle an FTCA claim]."); Veterans' Benefits Act, 38 U. S. C. § 5904(d)(1) (1994 ed.) ("When a claimant [for veterans' benefits] and an attorney have entered into a [contingent-]fee agreement [under which fees are paid by withholding from the claimant's benefits award], the total fee payable to the attorney may not exceed 20 percent of the total amount of any past-due benefits awarded

---

[11] See also, *e. g.,* 31 U. S. C. § 3554(c)(4) (1994 ed.) ("[T]he Federal agency and the interested party shall attempt to reach an agreement on the amount of the costs [including attorneys' fees] to be paid.").

on the basis of the claim.").[12]  Characteristically in cases of the kind we confront, attorneys and clients enter into contingent-fee agreements "specifying that the fee will be 25 percent of any past-due benefits to which the claimant becomes entitled."  Brief for National Organization of Social Security Claimants' Representatives as *Amicus Curiae* 2; see Brief for Washington Legal Foundation et al. as *Amici Curiae* 9, n. 6 ("There is no serious dispute among the parties that virtually every attorney representing Title II disability claimants includes in his/her retainer agreement a provision calling for a fee equal to 25% of the past-due benefits awarded by the courts.").

Contingent fees, though problematic, particularly when not exposed to court review, are common in the United States in many settings.  Such fees, perhaps most visible in

---

[12] See also Servicemembers' Group Life Insurance Act, 38 U. S. C. § 1984(g) (1994 ed.) ("[T]he court . . . shall determine and allow reasonable fees for the attorneys of the successful party or parties and apportion same if proper, said fees not to exceed 10 per centum of the amount recovered and to be paid by the Department out of the payments to be made under the judgment or decree."); International Claims Settlement Act of 1949 (ICSA), 22 U. S. C. § 1623(f) ("No remuneration on account of services rendered on behalf of any claimant in connection with any claim filed with the Commission under [the ICSA] shall exceed 10 per centum of the total amount paid pursuant to any award certified under the [ICSA] on account of such claim.  Any agreement to the contrary shall be unlawful and void."); Trading with the Enemy Act, 50 U. S. C. App. § 20 (1994 ed.) ("No property or interest or proceeds shall be returned under this Act . . . unless satisfactory evidence is furnished . . . that the aggregate of the fees to be paid to all agents, attorneys . . . , or representatives, for services rendered in connection with such return or payment or judgment does not exceed 10 per centum of the value of such property or interest or proceeds or of such payment."); War Claims Act, 50 U. S. C. App. § 2017m ("No remuneration on account of services rendered on behalf of any claimant in connection with any claim filed with the Commission under this [Act] shall exceed 10 per centum (or such lesser per centum as may be fixed by the Commission with respect to any class of claims) of the total amount paid pursuant to any award certified under the provisions of this title . . . on account of such claim.").

tort litigation, are also used in, *e. g.*, patent litigation, real estate tax appeals, mergers and acquisitions, and public offerings. See ABA Formal Opinion 94–389, ABA/BNA Lawyers' Manual On Professional Conduct 1001:248, 1001:250 (1994). But see *id.*, at 1001:248, n. 3 (quoting observation that controls on contingent fees are needed to "reduce financial incentives that encourage lawyers to file unnecessary, unwarranted[,] and unmeritorious suits" (internal quotation marks omitted)). Traditionally and today, "the marketplace for Social Security representation operates largely on a contingency fee basis." SSA Report 3; see also *id.*, at 15, 66, 70; App. to Pet. for Cert. 56, 60, 88, 89, 91 (affidavits of practitioners).

Before 1965, the Social Security Act imposed no limits on contingent-fee agreements drawn by counsel and signed by benefits claimants. In formulating the 1965 Social Security Act amendments that included § 406(b), Congress recognized that "attorneys have upon occasion charged . . . inordinately large fees for representing claimants [in court]." S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, p. 122 (1965). Arrangements yielding exorbitant fees, the Senate Report observed, reserved for the lawyer one-third to one-half of the accrued benefits. *Ibid.* Congress was mindful, too, that the longer the litigation persisted, the greater the buildup of past-due benefits and, correspondingly, of legal fees awardable from those benefits if the claimant prevailed. *Ibid.*[13]

Attending to these realities, Congress provided for "a reasonable fee, not in excess of 25 percent of accrued bene-

---

[13] Congress also adopted a proposal recommended by the Social Security Administration that attorneys be paid directly with funds withheld from their clients' benefits awards; the Commissioner testified to the Senate Committee on Finance that "[a]ttorneys have complained that . . . awards are sometimes made to the claimant without the attorney's knowledge and that some claimants on occasion have not notified the attorney of the receipt of the money, nor have they paid his fee." Hearings on H. R. 6675 before the Senate Committee on Finance, 89th Cong., 1st Sess., pt. 1, pp. 512–513 (1965).

fits," as part of the court's judgment, and further specified that "no other fee would be payable." *Ibid.* Violation of the "reasonable fee" or "25 percent of accrued benefits" limitation was made subject to the same penalties as those applicable for charging a fee larger than the amount approved by the Commissioner for services at the administrative level— a fine of up to $500, one year's imprisonment, or both. *Ibid.* "[T]o assure the payment of the fee allowed by the court," Congress authorized the agency "to certify the amount of the fee to the attorney out of the amount of the accrued benefits." *Ibid.;* see *supra,* at 804, n. 13.

Congress thus sought to protect claimants against "inordinately large fees" and also to ensure that attorneys representing successful claimants would not risk "nonpayment of [appropriate] fees." SSA Report 66 (internal quotation marks omitted). But nothing in the text or history of § 406(b) reveals a "desig[n] to prohibit or discourage attorneys and claimants from entering into contingent fee agreements." *Ibid.* Given the prevalence of contingent-fee agreements between attorneys and Social Security claimants, it is unlikely that Congress, simply by prescribing "reasonable fees," meant to outlaw, rather than to contain, such agreements.[14]

This conclusion is bolstered by Congress' 1990 authorization of contingent-fee agreements under § 406(a), the provision governing fees for agency-level representation. Before enacting this express authorization, Congress instructed the Social Security Administration to prepare a report on attor-

---

[14] Cf., *e. g.,* Act of Mar. 3, 1891, § 9, 26 Stat. 851–854 (regulating fees for claims by Native Americans before the Court of Claims and providing: "all contracts heretofore made for fees and allowances to claimants' attorneys, are hereby declared void . . . and the allowances to the claimant's attorneys shall be regulated and fixed by the court"); Alaska Native Claims Settlement Act of 1971, 43 U. S. C. § 1621(a) (1994 ed.) ("None of the revenues granted by [the Act] shall be subject to any contract which is based on a percentage fee of the value of all or some portion of the settlement granted by this [Act].").

ney's fees under Title II of the Social Security Act. Pub. L. 100–203, § 9021(b), 101 Stat. 1330–295. The report, presented to Congress in 1988, reviewed several methods of determining attorney's fees, including the lodestar method. See SSA Report 10–11. This review led the agency to inform Congress that, although the contingency method was hardly flawless, the agency could "identify no more effective means of ensuring claimant access to attorney representation." *Id.*, at 25.

Congress subsequently altered § 406(a) to validate contingent-fee agreements filed with the agency prior to disposition of the claim for benefits. See 42 U. S. C. § 406(a)(2) (1994 ed.); *supra,* at 795. As petitioners observe, Brief for Petitioners 24, it would be anomalous if contract-based fees expressly authorized by § 406(a)(2) at the administrative level were disallowed for court representation under § 406(b).

It is also unlikely that Congress, legislating in 1965, and providing for a contingent fee tied to a 25 percent of past-due benefits boundary, intended to install a lodestar method courts did not develop until some years later. See *supra,* at 801–802. Furthermore, we again emphasize, the lodestar method was designed to govern imposition of fees on the losing party. See, *e. g., Dague,* 505 U. S., at 562. In such cases, nothing prevents the attorney for the prevailing party from gaining additional fees, pursuant to contract, from his own client. See *Venegas* v. *Mitchell,* 495 U. S. 82, 89–90 (1990) ("[None] of our cases has indicated that [42 U. S. C.] § 1988 . . . protects plaintiffs from having to pay what they have contracted to pay, even though their contractual liability is greater than the statutory award that they may collect from losing opponents. Indeed, depriving plaintiffs of the option of promising to pay more than the statutory fee if that is necessary to secure counsel of their choice would not further § 1988's general purpose of enabling such plaintiffs . . . to secure competent counsel."). By contrast, § 406(b) governs the total fee a claimant's attorney may receive for court representation; any endeavor by the claimant's attorney to

gain more than that fee, or to charge the claimant a noncontingent fee, is a criminal offense. 42 U. S. C. § 406(b)(2); 20 CFR § 404.1740(c)(2) (2001).

Most plausibly read, we conclude, § 406(b) does not displace contingent-fee agreements as the primary means by which fees are set for successfully representing Social Security benefits claimants in court. Rather, § 406(b) calls for court review of such arrangements as an independent check, to assure that they yield reasonable results in particular cases.[15] Congress has provided one boundary line: Agreements are unenforceable to the extent that they provide for fees exceeding 25 percent of the past-due benefits. § 406(b)(1)(A) (1994 ed., Supp. V).[16] Within the 25 percent boundary, as petitioners in this case acknowledge, the attorney for the successful claimant must show that the fee sought is reasonable for the services rendered. See Brief for Petitioners 40.[17]

---

[15] The dissent observes that "fee agreements in . . . Social-Security cases are hardly negotiated; they are akin to adherence contracts." *Post*, at 812. Exposure to court review, plus the statute's 25 percent limitation, however, provide checks absent from arbitration adherence provisions this Court has upheld over objections that they are not "freely negotiated," see *Vimar Seguros y Reaseguros, S. A.* v. *M/V Sky Reefer*, 515 U. S. 528, 556 (1995) (STEVENS, J., dissenting), but are the product of "disparate bargaining power" between the contracting parties, *Carnival Cruise Lines, Inc.* v. *Shute*, 499 U. S. 585, 598 (1991) (STEVENS, J., dissenting). See also *Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105, 138–139, and n. 3 (2001) (SOUTER, J., dissenting) (observing that many employees "lack the bargaining power to resist an arbitration clause if their prospective employers insist on one").

[16] Statement of the limitation in terms of a percent of the recovery tellingly contrasts with EAJA, which authorizes fee shifting and, correspondingly, places a specific dollar limit on the hourly rate that ordinarily can be charged to the losing party. 28 U. S. C. § 2412(d)(2)(A); see *supra*, at 796, and n. 4.

[17] Specifically, petitioners maintain that "[a]lthough section 406(b) permits an attorney to base a fee application on a contingent fee agreement with the claimant, the statute does not create any presumption in favor of the agreed upon amount. To the contrary, because section 406(b) requires an affirmative judicial finding that the fee allowed is 'reasonable,' the

Courts that approach fee determinations by looking first to the contingent-fee agreement, then testing it for reasonableness, have appropriately reduced the attorney's recovery based on the character of the representation and the results the representative achieved. See, *e. g.*, *McGuire*, 873 F. 2d, at 983 ("Although the contingency agreement should be given significant weight in fixing a fee, a district judge must independently assess the reasonableness of its terms."); *Lewis* v. *Secretary of Health and Human Servs.*, 707 F. 2d 246, 249–250 (CA6 1983) (instructing reduced fee when representation is substandard). If the attorney is responsible for delay, for example, a reduction is in order so that the attorney will not profit from the accumulation of benefits during the pendency of the case in court. See *Rodriquez*, 865 F. 2d, at 746–747. If the benefits are large in comparison to the amount of time counsel spent on the case, a downward adjustment is similarly in order. See *id.*, at 747 (reviewing court should disallow "windfalls for lawyers"); *Wells*, 907 F. 2d, at 372 (same). In this regard, the court may require the claimant's attorney to submit, not as a basis for satellite litigation, but as an aid to the court's assessment of the reasonableness of the fee yielded by the fee agreement, a record of the hours spent representing the claimant and a statement of the lawyer's normal hourly billing charge for noncontingent-fee cases. See *Rodriquez*, 865 F. 2d, at 741. Judges of our district courts are accustomed to making reasonableness determinations in a wide variety of contexts, and their assessments in such matters, in the event of an appeal, ordinarily qualify for highly respectful review.

\* \* \*

The courts below erroneously read § 406(b) to override customary attorney-client contingent-fee agreements. We hold that § 406(b) does not displace contingent-fee agree-

attorney bears the burden of persuasion that the statutory requirement has been satisfied." Brief for Petitioners 40.

ments within the statutory ceiling; instead, §406(b) instructs courts to review for reasonableness fees yielded by those agreements. Accordingly, we reverse the judgment of the Court of Appeals for the Ninth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, dissenting.

I do not know what the judges of our district courts and courts of appeals are to make of today's opinion. I have no idea what the trial judge is to do if he finds the fee produced by the ("presumptively reasonable," *ante*, at 792) contingent-fee agreement to be 25% above the lodestar amount; or 40%; or 65%. Or what the appellate court is to do in an appeal from a district judge's reduction of the contingent fee to 300% of the lodestar amount; or 200%; or to the lodestar amount itself. While today's opinion gets this case out of our "in" box, it does nothing whatever to subject these fees to anything approximating a uniform rule of law. That is, I think, the inevitable consequence of trying to combine the incompatible. The Court tells the judge to commence his analysis with the contingent-fee agreement, but then to adjust the figure that agreement produces on the basis of factors (most notably, the actual time spent multiplied by a reasonable hourly rate, *ante*, at 808) that are, in a sense, the precise antithesis of the contingent-fee agreement, since it was the very *purpose* of that agreement to eliminate them from the fee calculation. In my view, the only possible way to give uniform meaning to the statute's "reasonable fee" provision is to understand it as referring to the fair value of the work actually performed, which we have held is best reflected by the lodestar.[1] See *Hensley* v. *Eckerhart*, 461 U. S. 424, 433 (1983).

---

[1] The Court finds it "unlikely," *ante*, at 806, that 42 U. S. C. §406(b) (1994 ed.), enacted in 1965, contemplated application of the lodestar method that the courts had not yet even developed. Of course it did not. But it *did*

I think it obvious that the reasonableness of a contingent-fee arrangement *has to be* determined by viewing the matter *ex ante*, before the outcome of the lawsuit and the hours of work expended on the outcome are definitively known. For it is in the nature of a contingent-fee agreement to *gamble* on outcome and hours of work—assigning the risk of an unsuccessful outcome to the attorney, in exchange for a percentage of the recovery from a successful outcome that will (because of the risk of loss the attorney has borne) be higher, and perhaps much higher, than what the attorney would receive in hourly billing for the same case. That is why, in days when obtaining justice in the law courts was thought to be less of a sporting enterprise, contingent fees were unlawful. See, *e. g., Butler* v. *Legro*, 62 N. H. 350, 352 (1882) ("Agreements of this kind are contrary to public justice and professional duty, tend to extortion and fraud, and are champertous and void").

It is one thing to say that a contingent-fee arrangement is, *ex ante*, unreasonable because it gives the attorney a percentage of the recovery so high that no self-respecting legal system can tolerate it; the statute itself has made this determination for Social-Security-benefit cases, prescribing a maximum contingent fee of 25%. And one can also say that a contingent-fee arrangement is, *ex ante*, unreasonable because the chances of success in the particular case are so high, and the anticipated legal work so negligible, that the percentage of the recovery assured to the lawyer is exorbitant; but neither I nor the Court thinks that the "reasonable

contemplate an *ex post* determination of a reasonable fee for an attorney's work—which our post-1965 cases have held is best achieved by using the lodestar. We have not hesitated to apply the lodestar method to other fee statutes enacted before the method was developed. See, *e. g., Burlington* v. *Dague*, 505 U. S. 557, 561–562 (1992) (explaining that "our case law construing what is a 'reasonable' fee applies uniformly" to fee-shifting statutes that use similar language, including, *inter alia*, 42 U. S. C. § 1988 and 42 U. S. C. § 2000e–5(k) (Civil Rights Act of 1964)).

fee" provision of the statute anticipates such a case-by-case *ex post* assessment of *ex ante* predictions in the thousands of (mostly small recovery) Social-Security-benefit cases. It is something quite different, however—and something quite irrational—to look at the *consequences* of a contingent-fee agreement *after the contingencies have been resolved,* and proclaim those consequences unreasonable because the attorney has received too much money for too little work. That is rather like declaring the purchase of the winning lottery ticket void because of the gross disparity between the $2 ticket price and the million-dollar payout.[2]

I think, in other words, that the "reasonable fee" provision must require *either* an assessment of the reasonableness of the contingent-fee agreement when it was concluded, *or* an assessment of the reasonableness of the fee charged after the outcome and work committed to it are known; it cannot combine the two. And since an *ex post* assessment of the *ex ante* reasonableness of the contingent-fee agreement (already limited by statute to a maximum 25% of the recovery) is not what the statute could conceivably have contemplated, I conclude that a "reasonable fee" means not the reasonableness of the agreed-upon contingent fee, but a reasonable recompense for the work actually done. We have held that this is best calculated by applying the lodestar,

---

[2] There is one *ex post* element prominent in Social-Security-benefit cases that assuredly should reduce the amount of an otherwise reasonable (that is to say, an *ex ante* reasonable) contingent-fee award: Since the award is based upon past-due benefits, and since the amount of those benefits increases with the duration of the litigation, a lawyer can increase his contingent-fee award by dragging his feet. It is unreasonable to be rewarded for dilatoriness. But *that* element need not be made part of an overall *ex post* reasonableness assessment, as the Court would do, see *ante,* at 808. For it is not only unreasonable; it is a breach of contract. Surely the representation agreement contains as an implicit term that the lawyer will bring the matter to a conclusion as quickly as practicable—or at least will not intentionally delay its conclusion. Any breach of that condition justifies a reduction of the contracted contingent-fee award.

which focuses on the quality and amount of the legal work performed, and "provides an objective basis on which to . . . estimate . . . the value of a lawyer's services." *Hensley,* 461 U. S., at 433.

This is less of a departure than the Court suggests from the normal practice of enforcing privately negotiated fee agreements. The fee agreements in these Social-Security cases are hardly negotiated; they are akin to adherence contracts. It is uncontested that the specialized Social-Security bar charges uniform contingent fees (the statutory maximum of 25%), which are presumably presented to the typically unsophisticated client on a take-it-or-leave-it basis. Nor does the statute's explicit approval of contingency-fee agreements at the agency stage, see 42 U. S. C. § 406(a) (1994 ed. and Supp. V), imply that contingency-fee agreements at the judicial-review stage should be regarded as presumptively reasonable. The agreements approved at the agency stage are limited not merely by a 25% maximum percentage of recovery, but also by a firm $5,300 maximum. With the latter limitation, there is no need to impose a reasonableness requirement. Once a reasonableness requirement is imposed, however, I think it can only refer to the reasonableness of the actual compensation.

\*    \*    \*

Because I think there is no middle course between, on the one hand, determining the reasonableness of a contingent-fee agreement and, on the other hand, determining the reasonableness of the actual fee; because I think the statute's reference to a "reasonable fee" must connote the latter; and because I think the Court's hybrid approach establishes no clear criteria and hence will generate needless satellite litigation; I respectfully dissent.